| | | |
|---|---|---|
| JANE DOE, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:04-cv-1976 (JCH) |
| | : | |
| NORWALK COMMUNITY COLLEGE, | : | |
| BOARD OF TRUSTEES, CONNECTICUT | : | |
| COMMUNITY COLLEGES, and | : | |
| RONALD MASI, individually, | : | JULY 16, 2007 |
| Defendants. | : | |

**RULING ON PLAINTIFF'S MOTION FOR SANCTIONS [Doc. No. 101]**

## I.      INTRODUCTION

The plaintiff, Jane Doe, brings this action against Norwalk Community College

("NCC") and the Board of Trustees, Connecticut Community Colleges ("Board")

(collectively, the "defendants"), as well as against Ronald Masi in his individual capacity.

In her Amended Complaint [Doc. No. 31], Doe alleges violations of Title IX of the

Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.  Doe also asserts state law

claims of negligent retention and supervision and negligent infliction of emotional

distress.

Doe has filed a Motion for Sanctions for Discovery Misconduct and Spoliation of

Evidence against the college defendants [Doc. No. 101].[1]  This court assumes

familiarity with the underlying facts of this case.

---

[1]In a separate Ruling, issued today, this court denies the defendants' Motion for
Summary Judgment [Doc. No. 95] on the Title IX counts.

## II.    FACTS

On November 22, 2004, Doe filed her Complaint initiating this lawsuit; she amended her Complaint on July 29, 2005 [Doc. Nos. 1 & 31].  On March 1, 2006, Doe moved to compel the inspection of certain electronic records possessed by NCC [Doc. No. 53], and a hearing was held on the motion before Magistrate Judge Holly Fitzsimmons on April 26, 2006.  At the hearing, Dorran Delay of DataTrack Resources, LLC, a forensic computer firm retained by Doe to inspect NCC's computer records, testified regarding his qualifications to perform the inspection.  On July 20, 2006, the court granted Doe's Motion to Compel, thereby permitting Delay to perform the inspection [Doc. No. 88].

On August 15 and August 18, 2006, Delay carried out the inspection of certain NCC computers, which he memorialized in memoranda dated September 11 and October 3, 2006 [Doc. No. 121, Ex. A & B].  Doe subsequently submitted two affidavits, written by Delay, as part of her Motion for Sanctions [Doc. No. 101, Ex. 18, Vol I; Doc. No. 116].  In response to Delay's first affidavit, NCC's Information Technology Technician, Wyatt Bissell, submitted an affidavit as well [Doc. No. 112, Ex. A].  Their findings will be discussed below, where relevant.

This court scheduled a hearing on Doe's Motion for Sanctions, to take testimony from the computer experts regarding their results.  At the hearing held on June 26, 2007 ("Hearing I"), Delay as well as Bissell were examined by counsel on both sides; additionally, the defendants presented the testimony of Mr. Olsen, the systems manager for Connecticut Community Colleges.  On July 5, 2007, the court heard further testimony from Bissell and Delay ("Hearing II"), and also held Oral Argument regarding

some of the remaining legal and factual issues involved in this Motion for Sanctions.

## III.  DISCUSSION

### A.  Spoliation of Evidence

Doe seeks an adverse evidentiary inference with regard to electronic files which she claims the defendants destroyed.  Spoliation of evidence has been explained by the Second Circuit as:

> "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).  The spoliation of evidence germane "to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction."  Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998).  This sanction serves a threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation.  See West, 167 F.3d at 779.  In borderline cases, an inference of spoliation, in combination with "some (not insubstantial) evidence" for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment.  Kronisch, 150 F.3d at 128.

Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93 (2d Cir. 2001).  However, "[t]he determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, . . . and is assessed on a case-by-case basis."  Fujitsu Ltd. v. Federal Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001).

A party seeking an adverse inference based on spoliation must establish "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

3

Residential Funding Corp. v. Degeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002).

Doe claims that "the hard drives of key witnesses in this case were scrubbed" or "completely 'wiped' of data." See Plf.'s Memorandum in Support of Motion for Sanctions at 39 ("Mem. in Supp. of Sanctions") [Doc. No. 101].[2] Such assertions are based on the conclusions of Delay, who inspected NCC's computer records using special forensic software. Delay explained in his affidavit and at the Hearing that Seaborn's computer had been replaced in December 2004, one month after Doe filed her lawsuit, and that Seaborn's old computer "was totally devoid of data[; i]t appears to have had its data 'wiped.'"[3] See Plf.'s Stat. at Vol. I, Ex. 18, Delay Aff. at ¶ 5.

Additionally, Delay found the Microsoft Outlook PST files, which house electronic mailboxes, of four individuals had inconsistencies "that indicate[] that data has been altered, destroyed or filtered." Id. at ¶ 6. For example, Professor Skeeter's PST file contained no Deleted Items and only one Sent Item and the Inbox and Sent Items contained data starting August 2004, "even though other activity is present starting in 2002." Id. at ¶ 8. Doe has also presented evidence that the retention policy issued by the State Library, which provides for a two-year retention with respect to electronic correspondence, governs NCC retention, see id. at Vol. II, Ex. 11, NCC Dep. at 3-4; 55, and that this policy was not followed with respect to the hard drives of the computers of faculty members who left the college, id. at 56.

_____

[2]Although Doe has filed a single Memorandum, containing both her opposition to the defendants' Motion for Summary Judgment and her support for her Motion for Sanctions, the memorandum was docketed as two separate entries, one representing each motion.

[3]According to Delay, wiping is a "process that overwrites existing data on the hard drive, making this information unrecoverable." See Plf.'s Stat. at Vol. I, Ex. 18, Delay Aff. at ¶ 5.

In response, the defendants argue that the hard drive that Delay thought belonged to Seaborn's old computer was in fact from Anita Schmidt's computer; she was NCC's affirmative action officer who retired in the spring of 2006 and is presently an adjunct professor. According to Bissell's testimony at Hearing II, Schmidt's computer was removed from her office mid-summer and was placed in NCC's workshop with a handwritten label on it. In August 2006, Delay inspected Levinson's, Schmidt's, Seaborn's, and Dellamura's hard drives; Bissell testified that Delay could not have examined Seaborn's old computer because it had been replaced in December 2004 and was either de-commissioned because it was too old or re-imaged to be given to a new user. Bissell further testified that Delay's results, i.e., that it appeared that this particular hard drive had been "scrubbed" were because Schmidt's hard drive was in the process of failing, which can produce inconsistent or corrupt results.

Bissell also testified that, although he was familiar with the State Librarian's document retention policy, NCC did not follow it because, according to him, it did not apply to "normal computer usage" and transitory email messages did not need to be maintained.[4] Additionally, the defendants argue that "evidence discussing Defendant Masi contained in various backup servers as well as computers from NCC faculty and staff were turned over to the plaintiff," thus presenting "powerful evidence" that the defendants did not destroy all emails or documents regarding Masi. See Def.'s Memorandum in Opposition to Motion for Sanctions ("Mem. in Opp. to Sanctions) at 6 [Doc. No. 112]. The defendants claim that they provided Doe with "approximately six

---

[4]The defendants could not point to any written policy which supports this view.

emails" referencing Masi, <u>see</u> <u>id.</u> at 8, one of which was written by someone who claims Masi "was always touching me," <u>id.</u> at Ex. A, Attachment 4, at 5. Although the defendants rely on the fact that this email was written more than three months prior to Doe's filing of her lawsuit, <u>see</u> <u>id.</u> at 8-9, the court finds that because this email post-dates the incident with Masi by six months, it does not respond to Doe's argument that certain evidence was destroyed "that would support the plaintiff's claim that NCC had actual notice of Masi's conduct" prior to the incident of which she complained, <u>see</u> Plf.'s Mem. in Opp. at 3.[5]

### 1. <u>Duty to Preserve</u>

The court finds that Doe has established the first prong of the adverse inference instruction, that the party having control over the evidence had an obligation to preserve it at the time it was destroyed. Such an obligation to preserve evidence "usually arises when a party has notice that the evidence is relevant to litigation . . . but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation." <u>Byrnie</u>, 243 F.3d at 107; <u>see also</u> <u>Fujitsu</u>, 247 F. 3d at 436. In this case, the defendants argue that the duty to preserve did not arise until well after Doe filed her lawsuit in November 2004, perhaps when Doe had indicated her need for the electronic discovery in her Rule 26(f) Report, dated February 18, 2005 [Doc. No. 19]. <u>See</u> Def.'s Mem. in Opp. at 10.

---

[5]Even the defendants appear to admit that "the documents relevant for College Defendants liability are not those in the present case involving the present plaintiff, but instead <u>prior complaints</u> against Mr. Masi which gave NCC officials who had authority to institute corrective measures actual notice, together with any deliberate indifference on their part." <u>See</u> Def.'s Mem. in Opp. to Sanctions at 13 n.13.

The court strongly disagrees with the defendants. Under the most generous reading of Byrnie, the court finds that the duty to preserve certainly arose no later than September 2004, when Doe's counsel sent the defendants a demand letter indicating Doe's intention to sue NCC. In fact, the court believes the duty to preserve had arisen by February 13, 2004, when a meeting was held between Dean Fisher, Professor Skeeter and Professor Seaborn regarding the Doe incident, which indicates to the court that, as of that date, NCC was aware of Doe's allegations of sexual assault by Masi. Plf.'s Stat. at Vol. II, Ex. 7, Dellamura Dep. at 32-33; see Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216-17 (S.D.N.Y. 2003) (duty to preserve arose even before EEOC complaint was filed). At that time, even if Doe had not yet filed her lawsuit, the defendants should have known that any documents, including e-mails and hard drives, related to Professor Masi could potentially be relevant to future litigation. Indeed, because of the reasons surrounding Masi's resignation, it appears to this court that the defendants "should have known" at that time that Masi's hard drive may be relevant to future litigation involving him. See Plf.'s Reply at 5-6 (noting that there was a pending criminal investigation by the Connecticut state police beginning in February 2004, which resulted in prosecution for fourth degree sexual assault in August 2004).

"The duty to preserve attached at the time that litigation was reasonably anticipated." Zubulake, 220 F.R.D. at 217. At that time, the defendants "must suspend [their] routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." Id. at 218. However, NCC did not do so. Indeed, the defendants admit that they "scrubbed" Masi's hard drive "pursuant to

normal NCC practice."[6]  See Def.'s Mem. in Opp. at 11.  Even if the court assumes the

duty to preserve generally arose in September 2004, it finds that the defendants should

not have "scrubbed" Masi's computer after his resignation because of the state criminal

investigation against him.

Moreover, although NCC's official retention policy as it relates to electronic

correspondence is two years,[7] see Plf.'s Stat. at Vol. II, Ex. 11, NCC Dep. at 3-4; 55,

Dean Ellis testified that this policy was not followed with respect to the hard drives of

the computers of faculty members who left the college, and that this has happened in

this case.[8]  Id. at 56.  Moreover, the Registrar at NCC, Erika Vogel, testified at her

deposition on February 24, 2006, that she was unaware of this case until a few days

earlier and had never been asked to do a records search regarding the case.  Id. at 43-

44.  Finally, Virginia Dellamura, NCC's head of Human Resources, also testified that

---

[6]At the Hearing, Wyatt Bissell indicated that he disagreed with the term "scrubbed," which overwrites a hard drive, completely eliminating all data from it.  Instead, Bissell testified the correct word to use is "imaged" – that is, NCC's technology modifies the structure of the hard drive, without scrubbing it.  The court's understanding of the term "scrubbed" will be discussed infra at 10 n.9.

[7]Although at Hearing I, NCC officials Bissell and Olsen indicated that they were not aware of any retention policies that applied to them, Dean Ellis, who is Bissell's boss, according to his testimony at the Hearing, testified that the records retention policy at NCC is two years, pursuant to State Library policy.  Id. at 55; see also id. at 3, 13.

[8]Dean Ellis further testified at her deposition on February 24, 2006, that computer hard drives had been "scrubbed" of information.  Id. at 56, 58.  Bissell disagrees with the use of the term "scrub," and he testified at Hearing II that he indicated as much to Dean Ellis in August 2006, prior to Delay's investigation of the NCC computers.  However, despite Bissell's explanation of why the terms "scrubbing" and "wiping" were incorrect, the defendants failed to amend their March 9, 2006 Supplemental Response to Plaintiff's Second Set of Request for Production of Documents, in which they stated that "Dean Fischer and Professor Skeeter computers were scrubbed with their departure from the College prior to the institution of this lawsuit and any documents on their computers no longer exist."  Id. at Vol. I, Ex. 7 (emphasis added).

she has never heard of the term "litigation hold," and she was never told to refrain from destroying documents during the pendency of this litigation.  Id. at 13, 15.

With respect to the destruction of electronic data, the defendants cite to newly-promulgated Rule 37(f) of the Federal Rules of Civil Procedure, which states:  "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system."  Fed. R. Civ. P. 37(f). However, the Commentary to that Rule indicates that, "[w]hen a party is under a duty to preserve information because of pending or reasonably anticipated litigation, intervention in the routine operation of an information system is one aspect of what is often called a 'litigation hold.'"  Id. at Advisory Committee Notes to 2006 Amendment. Thus, in order to take advantage of the good faith exception, a party needs to act affirmatively to prevent the system from destroying or altering information, even if such destruction would occur in the regular course of business.  Because the deendants failed to suspend it at any time, see supra at 6, the court finds that the defendants cannot take advantage of Rule 37(f)'s good faith exception.

In addition, as the Commentary to Rule 37(f) indicates, the Rule only applies to information lost "due to the 'routine operation of an electronic information system' – the ways in which such systems are generally designed, programmed, and implemented to meet the party's technical and business needs."  See Fed. R. Civ. P. 37(f) at Advisory Committee Notes to 2006 Amendment.  This Rule therefore appears to require a routine system in order to take advantage of the good faith exception, and the court cannot find that the defendants had such a system in place.  Indeed, testimony at the

Hearings revealed that, after NCC shifted over to the Hartford server in August 2004, emails were backed up for one year; however, emails pre-dating this transfer were only retained for six months or less. Thus, the defendants did not appear to have one consistent, "routine" system in place, and Bissell admitted at Hearing II that the State Librarian's policy was not followed. Counsel for the defendants also indicated at Oral Argument that he was not aware that the defendants did anything to stop the destruction of the backup tapes after NCC's obligation to preserve arose.[9]

Finally, with respect to the dispute over whether Delay investigated Seaborn's old computer or Schmidt's computer, the court first notes that Delay testified at Hearing II that NCC officials told him it was Seaborn's old hard drive when he inspected it and that no one corrected him regarding the identity of the hard drives he inspected. Defense counsel prodded Delay on cross-examination as to why he had not asked specifically either why he had not investigated Schmidt's computer despite it being listed in the parties' confidentiality agreement or which particular hard drives he wanted to re-inspect. However, the court credits Delay's answers that he simply inspected the hard drives he was given and that Bissell understood which ones had to be re-done at Delay's second visit to NCC. Delay's job was to inspect hard drives; it would have been the defendants' job to correct Delay if he was misinformed regarding the identity of the

---

[9]The court finds the defendants' argument that they had no choice but to continue the routine deletion of the backup server, because the plaintiff in this case is a Jane Doe plaintiff and they would otherwise have had to reveal her identity, to be unavailing. As the court offered at Oral Argument, the defendants could at least have conferred with Doe's counsel regarding this question of how to send a systemwide communication on document retention without revealing Doe's real name. Alternatively, they could have instructed employees, most especially IT employees, to cease deletion or scrubbing of electronic data.

hard drives they gave to him to inspect.[10]

Moreover, regardless of whose hard drive this was, the court finds that Doe has established that it was "scrubbed" or wiped.[11] Even if it was in fact Schmidt's hard drive that Delay inspected, rather than Seaborn's, Delay found that it contained all 0's, indicating that every sector had been overwritten. Delay testified that, if the drive had data on it but was failing, as Bissell testified, then data would be seen on it with Delay's forensic software, which instead recognized that the hard drive was unpartitioned and contained no data. Moreover, Seaborn's new computer had traces of other users' information on it, thus showing an inconsistent result in NCC's process of re-imaging hard drives. Even if it was consistent with NCC's policy, the fact that Seaborn's new computer showed other users' information indicates that "imaging" does not eliminate everything from a hard drive, but leaves some data from old users on it, prompting the question why Seaborn's old computer – or Schmidt's computer – did not have any evidence of other users on it. The answers provided by the defendants – a failing drive or "re-imaging" – are rejected by the court as not credible.

## 2. Culpable State of Mind

As for the second prong of a spoliation of evidence claim, a culpable state of

---

[10]Delay discussed Seaborn's old computer in his Affidavit of January 10, 2007. <u>See</u> Plf.'s Stat. at Vol. I, Ex. 18, Delay Aff. at ¶ 5. The defendants never corrected Delay regarding the identity of this computer until after the record had closed in the Hearing on this motion. Indeed, Bissell's responding Affidavit, dated March 22, 2007, also referred to Seaborn's old computer without questioning whether it actually was. <u>See</u> Def.'s Mem. in Opp. at Ex. A. It was not until Hearing II that Bissell explained that this was a mistake, but that he had been focusing in his Affidavit not on the owner of the computer but on the process NCC used for imaging it.

[11]By "scrubbed" or "wiped" the court means more than overwriting or "reimaging;" it means eliminating all data from the hard drive, such that none of the old data can be read or still remains on it.

mind is established by ordinary negligence.  See Residential Funding Corp., 306 F.3d

at 108 (explaining that a "culpable state of mind" includes intentionality as well as In

Delay's Affidavit of January 10, 2007, he discusses Seaborn's old computer.  See Plf.'s Stat. at

Vol. I, Ex. 18, Delay Aff. at ¶ 5.  ordinary negligence, "because each party should bear the

risk of its own negligence").  Indeed, because this court has found that a duty to

preserve exists, and that the defendants breached that duty, "[o]nce the duty to

preserve attaches, any destruction of documents is, at a minimum, negligent."

Zubulake, 220 F.R.D. at 220.

However, the court finds more: it finds the defendants' failure to place a litigation

hold and to preserve emails and hard drives relevant to Doe's allegations in this case to

be at least grossly negligent, if not reckless.  Id. at 221; see In re NTL, Inc. Securities

Litigation, 2007 WL 241344, at *20 (S.D.N.Y. 2007); Chan v. Triple 8 Palace, Inc., 2005

WL 1925579, at *7 ("[T]he utter failure to establish any form of litigation hold at the

outset of litigation is grossly negligent.  That is what occurred here: the defendants

systematically destroyed evidence because they had never been informed of their

obligation to suspend normal document destruction policies."); Pastorello v. City of New

York, 2003 WL 1740606, at *11 (gross negligence where loss of data because of

unfamiliarity with record-keeping policy by employee responsible for preserving and

producing document).

The defendants claim that everything that happened was the result of a neutral

retention system with limited resources.  However, as discussed above, there is no

evidence that the defendants did anything to stop the routine destruction of the backup

tapes after NCC's obligation to preserve arose.  See supra at 9-10.  Moreover, with

respect to Delay's findings regarding the PST files, while the defendants explain that the reason for the deleted emails was because email storage space (mailbox) was limited to only 50 megabytes maximum of space, see Def.'s Mem. in Opp. at 23; Bissell Aff. at ¶ 4, according to Delay space was not a reason for the limited activity in Professors Schwab, Skeeter and Verna's mailboxes. Further, it is inexplicable how there could not be one mention of Masi or Doe in Schwab's PST file, when there are 500 other communications that surround the date of the incident. See Delay suppl. Affidavit at ¶ 4, 8. The court finds that this indicates selective destruction, evidencing intentional behavior.

Delay also found what appeared to have been evidence tampering – that is, several files were accessed and deleted within minutes of Delay's investigation, and two documents were deleted from Dellamura's files about a month after the Doe incident that had "sexual harassment" in their titles. See Delay suppl. Affidavit at ¶ 17. He also found significant activity on Professor's Seaborn's computer only a few days before his investigation – indeed, he found that 122 emails were sent or received at 8:43 a.m. on August 11, 2006, and that it appeared that files were copied into that computer at that time. Delay also found other activity occurred on Seaborn's computer on the morning of his investigation. Bissell testified that it was not likely another user than Seaborn had accessed her computer on those days, even if it was during summer vacation, because NCC did not know the ID's and passwords of each staff member; moreover, the defendants point to the fact that none of the 122 emails of August 11, 2006, involved Masi or the incidents in this case. While this last point may go to the third prong, the court credits the testimony of Delay, experienced in computer forensics,

13

who concluded that Seaborn's PST file was manipulated in the time period after Doe filed her lawsuit, when the defendants were "unquestionably on notice of [their] duty to preserve." Zubulake, 220 F.R.D. at 221. According to Delay, the large amount of activity all at once is uncommon and when he typically examines computers, there is no activity on the day of his investigation.

Moreover, the court finds at least gross negligence, if not more, in the defendants' replacing Seaborn's computer in December 2004, one month after this lawsuit was filed. Regardless of the fact that the entire business department at NCC may have received new computers, the defendants were involved in this litigation and Seaborn was one of its key players. Thus, they had a clear obligation to preserve Seaborn's old computer rather than decommissioning it or reimaging and reissuing it, as Bissell testified at Hearing II. At the very least, they should have kept track of what was done with her old computer.

### 3. Relevance

Finally, to establish the third prong of a spoliation of evidence claim, that the destroyed evidence is "relevant" to a party's claims, that party "must adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.'" Residential Funding Corp., 306 F.3d at 109 (citations omitted). However, because "holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference, . . . the level of proof that will suffice to support an inference in favor of the innocent party on a particular issue must be less than the

amount that would suffice to survive summary judgment on that issue."  Kronisch, 150

F.3d at 128.

Additionally,

[w]here a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party. . . .  Similarly, a showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party. . . .  Accordingly, where a party seeking an adverse inference adduces evidence that its opponent destroyed potential evidence (or otherwise rendered it unavailable) in bad faith or through gross negligence (satisfying the "culpable state of mind" factor), that same evidence of the opponent's state of mind will frequently also be sufficient to permit a jury to conclude that the missing evidence is favorable to the party (satisfying the "relevance" factor).

Residential Funding Corp., 306 F.3d at 109 (citations omitted).

As discussed above, Doe has demonstrated that the defendants' failure to

preserve hard drives and emails of certain key players in Doe's lawsuit was at a

minimum grossly negligent.  Therefore, no other proof of relevance is necessary, and

Doe is entitled to an adverse inference instruction.  See In re NTL, 2007 WL 241344, at

*22.

However, if the court were to only find the defendants to be negligent, Doe must

demonstrate that the destroyed evidence would have been relevant and favorable to

her.  Residential Funding Corp., 306 F.3d at 109.  "In the absence of bad faith or gross

negligence by the alleged spoliator, the relevance element can be established if the

moving party 'submit[s] extrinsic evidence tending to demonstrate that the missing

evidence would have been favorable to it.'"  In re NTL, 2007 WL 241344, at *21

(citations omitted).  Doe has supplied some proof that the missing evidence was likely

to be favorable to her: she has submitted an affidavit from R.M., in which R.M. states

that she sent Seaborn an email in 2004 "complaining about what happened to Jane

Doe in this case . . . [and] that the college could have stopped Masi after my complaint

but did nothing." <u>See</u> Plf.'s Stat. at Vol. I, Ex. 17, R.M. Aff. at ¶ 9.  That email has been

destroyed.  Doe also has evidence of a missing file, entitled "Masi_POL.doc," which

Delay found referenced but unrecoverable on Dellamura's computer.  <u>See</u> Delay suppl.

Affidavit at ¶ 17.  Thus, while not required to in light of the court's finding of at least

gross negligence, Doe has shown that the destroyed evidence was favorable to her

allegations.

Therefore, the court finds that Doe has established the elements of an adverse

inference based on spoliation: the defendants had an obligation to preserve the

evidence at the time it was destroyed; the defendants' failure to preserve evidence was

at a minimum grossly negligent; and even if the defendants' conduct was simple

negligence, Doe has established the relevance of the missing evidence.  <u>See</u>

<u>Residential Funding Corp.</u>, 306 F.3d at 107.  The court thus finds that Doe is entitled to

an adverse inference jury instruction with respect to the destroyed evidence.

### B.    Costs

Doe is entitled to an award of the costs that she incurred with this motion.  <u>See</u>

<u>Zubulake v. UBS Warburg LLC</u>, 229 F.R.D. 422, 437 (S.D.N.Y. 2004).  "Such a

monetary award 'may be appropriate to punish the offending party for its actions or to

deter [the] litigant's conduct, sending the message that egregious conduct will not be

tolerated.'"  <u>Chan</u>, 2005 WL 1925579, at *10 (citations omitted).  Such an award also

"serves the remedial purpose of making the opposing party whole for costs incurred as

a result of the spoliator's wrongful conduct."  <u>Id.</u>; <u>see also</u> <u>In re NTL</u>, 2007 WL 241344,

16

at *23.  "'[C]ompensable costs may arise either from the discovery necessary to identify alternative sources of information or from the investigation and litigation of the document destruction itself.'"  Chan, 2005 WL 1925579, at *10 (citations omitted).  In this case, Doe expended resources to retain Mr. Delay to perform the forensic investigation of NCC's computers, and those costs are compensable.[12]

### C.    Misdirection regarding identity of "Danielle"

Doe also seeks reimbursement of her fees and costs relating to the defendants' misdirection regarding the identity of "Danielle," a female student who allegedly had claimed that Masi engaged in sexually inappropriate conduct toward her sometime between 1999 and 2001.  See Plf.'s Mem. in Opp. at 9-18.  Doe claims that the defendants misled her into believing that the wrong student was in fact Danielle, thereby wasting much of plaintiff counsel's time and expenses in interviewing a student who Detective James Kline[13] ultimately determined did not fit the description Masi had previously given of her.  See Plf.'s Stat. at Vol. I, Ex. 15, Kline Supplemental Report. Doe also needlessly deposed Charles Kruschak.  She seeks to be reimbursed for these costs.

Doe first found out about the existence of Danielle through Masi's deposition, which was held on June 7, 2005.  Id. at Vol. II, Ex. 1, Masi Dep. at 39-44.  On June 23, 2005, Doe asked NCC regarding "Danielle" in her Third Set of Interrogatories, which the

---

[12]The award can be determined at the conclusion of this case, unless Doe wishes to file a Motion for Award of Costs at this time.  If she does, counsel should first confer with defense counsel to determine if they can stipulate to the amount.

[13]Detective Kline of the Connecticut State Police interviewed Masi and others after the alleged assault made on Doe.

defendants claim they did not receive until January 5, 2006.  See Def.'s Response to Plf.'s Motion for Extension of Time, at 1 [Doc. No. 55].  The defendants responded to the interrogatory on February 3, 2006, at which point they gave the name, address, and attendance information of "Danelie M."  See Plf.'s Stat. at Vol. I, Ex. 8, Def.'s Response to Third Set of Interrogatories.  On February 22, 2006, the defendants amended their response to give the names and addresses of three female students with the name Danielle, explaining that "[NCC] despite diligent effort is unable to determine who the student is that Mr. Masi referred to in his deposition."  Id. at Vol. I, Ex. 9, Def.'s Amended Response to Third Set of Interrogatories.

Doe deposed Charles Kruschak in early 2006, who was identified by Dean Drotman in her June 9, 2005 deposition as having some involvement with Danielle M.[14] Id. at Vol. II, Ex. 2, Drotman Dep. at 67.  Doe now claims that the cost of this deposition would never have been necessary "if NCC had timely identified the Daniela Masi discussed in his deposition."  See Plf.'s Reply at 10 [Doc. No. 113].  Doe argues that taking eight months to respond to a single interrogatory "makes no sense and should be sanctionable."  Id.

The court disagrees.  Although it is true that the defendants took eight months to respond to Doe's Third Set of Interrogatories, the court accepts at face value the defendants' assertion that they did not receive the Interrogatory until January 5, 2006. There is no evidence that Doe contacted the defendants during that eight month period to inquire why they had not yet responded, and thus some blame must be placed on

---

[14]Danielle M. became pregnant by Charles Kruschak, an NCC counselor, and, after she complained, a lengthy grievance proceeding was held against him.  See Plf.'s Mem. in Supp. at 16.

Doe for not affirmatively pursuing her options. Once the defendants received the Interrogatory, they only took only one month to respond to it; moreover, within three weeks of their response, they supplemented it. The court does not find that this timeline demonstrates undue delay on the part of the defendants, even if it occurred at the end of discovery. The fact that Doe ended up deposing the wrong person may be unfortunate; however, the court does not find that to be reason enough for imposing monetary sanctions on the defendants. Thus, the court denies Doe's Motion for Sanctions with respect to the Danielle discovery.

## IV.     CONCLUSION

Based on the foregoing analysis, Doe's Motion for Sanctions **[Doc. No. 101]** is GRANTED in part and DENIED in part. The court sanctions the defendants by allowing an adverse inference based on the spoliation of evidence, plus reimbursement for the retention of Delay in an amount to be determined. The court does not award costs relating to the deposition of Kruschak.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 16th day of July, 2007.


   /s/ Janet C. Hall
Janet C. Hall
United States District Judge

19